## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PAMERLA C. QUICK, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV-06-B-0500-S |
| | } | |
| THE CITY OF BIRMINGHAM, | } | |
| | } | |
| Defendant. | } | |
| | } | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant City of Birmingham's ("the City") Motion for Summary Judgment, (doc. 14).[1]  Quick has sued the City, alleging that she was subjected to a hostile work environment, retaliation, and disparate working conditions.  (Doc. 1.)  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 14), is due to be granted as to Quick's retaliation and disparate working conditions claims, and denied as to Quick's hostile work environment claim.

### I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56©, summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* At 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference.  *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS[2]

Quick was hired as a firefighter with the Birmingham Fire and Rescue Service ("BFRS") in August 1993.  (Doc. 14 at 1.)  On December 1, 2001 she was promoted to her current position, Apparatus Operator.  (Doc. 18, Ex. 3 at 42.)  Apparatus Operators are "responsible for driving the vehicle to the scene of any emergency" and "operating the pump and other equipment on the apparatus."  (Doc. 18, Ex. 3 at 43.)

According to Quick, throughout her employment with BFRS, she has heard sexist remarks from supervisors and coworkers on an almost daily basis, including "it is a man's world," and "[her job] is a man's job."  (Doc. 17 at 5.)  Quick also claims that male employees, including Captain Eric Smith, Apparatus Operator Kevin Friday, and Jeff Weatherbee, have told her that women should be "barefoot, pregnant, and in the kitchen."  (*Id.*)

Quick claims that on several occasions she was told by other female firefighters that they had been harassed.  For example, Quick claims that April Levins informed her that, beginning in February 2002, her captain, Captain Barton, would enter her sleeping area and attempt to force himself on top of her.  (Doc. 18, Ex. 4, ¶6(a)(vi).)  According to Quick, in 2005, Levins informed her that Captain Harry Williams "made sexual

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to Quick, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of Quick.  *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).  Furthermore, pursuant to Exhibit A of the court's Scheduling Order, (doc. 7), because the City failed to controvert Quick's Response's "Statement of Undisputed Facts," those facts are deemed admitted by the City for summary judgment purposes.

comments to her" whenever they worked together.  (Doc. 18, Ex. 4, ¶6(a)(vii).)  Quick

also claims that Linda Hopson, a female employee, told her that Chief Murray, Firefighter

Eric Smith, and Ural Mitchell had sexually harassed her.  (Doc. 18, Ex. 4, ¶6(a)(x).)

According to Quick, Delisa Allen, another female employee, told her that Lieutenant Joe

Matthews slapped her in the face.  (Doc. 18, Ex. 4, ¶6(a)(xi).)

On April 12, 2003, Quick was at her post, Station 7.  (Doc. 14 at 1.)  Captain Eric

Smith, Quick's superior, instructed her to attend a "round table meeting."  (*Id.*)  Quick

refused to attend the meeting.  (*Id.*)  Battalion Chief Robert Sorrell was called and arrived

at Station 7.  (*Id.*)  Quick informed Sorrell that Station 7 was a hostile work environment

and that she planned to file a complaint.  (*Id.*)  Sorrell transferred Quick to Station 8.

(*Id.*)

On April 14, 2003, Quick wrote a letter to Ann Thompson, an employee with the

City's Personnel Department, reiterating her complaints.  (Doc. 14 at 2.)  On April 23,

2003, Quick filed a gender discrimination charge with the Equal Employment

Opportunity Commission ("EEOC").  (*Id.*)  In her charge, Quick alleged that she had been

reassigned to another station during the investigation into her complaints, denied the

opportunity to be assigned to a truck company or hazardous materials unit, subjected to a

hostile work environment, not given the same respect as male drivers, and had her

suggestions to interact with other stations met with resistance.  (*Id.*)

BFRS's investigation revealed that many of Quick's allegations could not be substantiated, but that Quick had refused a direct order to attend a meeting.  (*Id.*)  As a result of the investigation, Captain Eric Smith received an Official Letter of Reprimand for having made the statement that Station 7 was "drug free and fag free."  (*Id.*)  Quick received an Official Letter of Reprimand for refusing a direct order.  (Doc. 14 at 3.)

On April 5, 2005 Quick filed her second charge with the EEOC, alleging hostility, animosity, and unfair treatment with regard to work assignments.  (*Id.*)  She also alleged that the City had retaliated against her through harassment, adverse job assignments, and transfers.  (*Id.*)  On March 13, 2006, Quick filed her Complaint.  (Doc. 1).  On May 15, 2006, Quick filed a grievance with BFRS that she was not exempted from the fitness run in exchange for her participation in the Mercedes Marathon.  (Doc. 14 at 4-5.)

Quick is assigned to the same station as Ural Mitchell.  (Doc. 18, Ex. 4, ¶6(a)(xiii).)  Since filing this action, Mitchell has called Quick a "bitch" and a "whore," made sexual comments and gestures to her, walked in on Quick in the bathroom, and touched her in offensive ways.  (Doc. 17 at 6.)

### III.  DISCUSSION

Quick alleges that the City subjected her to a hostile work environment, retaliated against her for her complaints of discrimination, and subjected her to sexually disparate treatment by providing inadequate shower, restroom, and changing facilities for female firefighters.

## A.  Hostile Environment

Quick's hostile work environment claim is based on her allegations of sexual harassment.  (Doc. 17 at 13.)  "To prove sexual harassment under Title VII, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists."[3]  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).

---

[3]In its Reply Brief, (doc. 23), the City argues that it had a Sexual and Gender Harassment Policy, that Quick signed an acknowledgment of the Policy, that Quick failed to avail herself of the Policy, and that the City has properly investigated each of Quick's complaints.  The City has also attached evidence of its Policy and what purports to be Quick's acknowledgment of the Policy.  (The acknowledgment is signed by Pam C. Smith.)  Had the City properly raised the *Faragher / Ellerth* defense, these arguments and evidence may have entitled the defendant to summary judgment on Quick's hostile environment claim.

However, as noted in Quick's Motion to Strike, (doc. 24), the City failed to raise the *Faragher / Ellerth* defense in its Answer, (doc. 4), or even in its Motion for Summary Judgment, (doc. 14).  Because the *Faragher / Ellerth* defense is an affirmative defense, it must be pled in the defendant's answer.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); Fed. R. Civ. P. 8©.  Therefore, Quick's Motion to Strike, (doc. 24), will be granted.  The court will not consider the *Faragher / Ellerth* defense, which the City raised for the first time in its Reply Brief.  The court also strikes the evidence submitted with the City's Reply Brief.  The evidence does not comply with this court's Scheduling Order, (doc. 7), and Quick did not have an opportunity to respond.

It is undisputed that Quick, a female, belongs to a protected group.  Her affidavit creates an issue of fact that she has been subjected to unwelcome harassment based on her sex.  (Doc. 18, Ex. 4.)

"In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Id.* at 1247-48.  "To be actionable under Title VII, a hostile work environment must be both 'objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." *Id.* at 1247.

A Title VII plaintiff is "under no obligation to adduce proof of sexual advances, requests for sexual favors [or] other verbal or physical conduct of a sexual nature." *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1503 (11th Cir. 1985).  *See also Cronin v. United Service Stations, Inc.*, 809 F.Supp. 922, 929 (M.D. Ala. 1992) ("to be actionable under Title VII, the conduct giving rise to a hostile or offensive work environment need not consist of sexual advances or have clear sexual overtones").  Therefore, threatening, bellicose, demeaning, or offensive conduct related to a person's sex may be considered as evidence of sexual harassment. *Bell*, 777 F.2d at 1503; *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1073 (M.D. Ala. 1990).

Quick alleges the following instances of sexual harassment:

On an almost daily basis she is told by co-workers and supervisors [that] "it is a man's world," or that "[firefighting] is a man's job."

On several occasions, co-workers and superiors [told] her that women should be barefoot, pregnant, and in the kitchen.

At least once a month, she hears sexist and derogatory remarks from male co-workers such as "are you going to whine like a woman?"

On more than one occasion, [Quick] heard firefighters making derogatory statements about the way women drive.

She knew of April Levins, a female firefighter, being subjected to numerous sexual overtures, remarks, and touching by her coworkers and superiors.

Her superiors would openly criticize women and speak to her in a demeaning and humiliating manner in front of her subordinates.

She knew Linda Hopson experienced sexually harassing conduct from Ural Mitchell, and Mrs. Hobson filed an E.E.O.C. Charge related to his conduct.  When [Quick] later began working with Mr. Mitchell, he (a) frequently called her a bitch and whore; (b) frequently made comments about sex to her; © made sexual gestures towards her; (d) licked her neck; (e) grabbed her thighs; (f) asked her for her phone number; and (g) walked in on her in the bathroom.

When the defendant transferred [Quick] to Station 24 in 2005, Chief Miskelley told her, "I pretty much let my boys run the show here."

Being directed to work below her classification, in contradiction of the defendant's policy, to drive a rescue vehicle.

Being told that women would not be sent on an assignment which would require sleeping and showering outside.

(Doc. 17 at 14-16.)

This combination of sexual overtures and comments demeaning to women is sufficient to create an issue of fact that Quick was subjected to harassment "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *See Hulsey*, 367 F.3d at 1244.[4]  Quick has submitted evidence that the harassment was frequent, severe, physically threatening and humiliating, and unreasonably interfered with her work performance. *See Hulsea*, 367 F.3d at 1247-48.

Quick has presented evidence that the harassment was frequent.  She stated that she was told on an almost daily basis that her job was a man's job.  (Doc. 17 at 14.)  She also stated that, at least once a month, she was asked whether she would "whine like a woman."  (Doc. 17 at 15.)  According to Quick, Mitchell "frequently called her bitch and whore [and] frequently made comments about sex to her."  (*Id.*)

Quick has also submitted evidence that she was subjected to "severe" conduct. She states that Mitchell made sexual gestures towards her, licked her neck, grabbed her

---

[4]Plaintiff testified that she was told by co-workers that other women firefighters had been sexually harassed.  The court has considered these incidents in determining whether plaintiff's work environment was hostile because of her gender; however, the effects of such incidents on plaintiff's work environment are tempered by the lack of direct effect on plaintiff.  "The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's working environment was actually made unbearable, as the worker claims.  Offense based purely on hearsay or rumor really is 'second hand'; it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than offense based on hearing or seeing . . . ." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007).

thighs, and walked in on her in the bathroom.  (Doc. 17 at 15-16.)  This conduct occurred

after Quick was informed by two female employees, Levins and Hopson, that they had

been sexually harassed by fellow employees and supervisors.  (Doc. 18, Ex. 4, ¶6(a).)  *See*

*Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991) (even racial remarks not

directed at the plaintiff may be considered as evidence of a hostile environment);

*Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (racial

remarks could not have contributed to the plaintiff's subjective view of a hostile

environment because they were not made known to the plaintiff until *after* her

termination).

 Quick has also submitted evidence that she was subjected to physically threatening

conduct.  Although much of her evidence involves only rude or sexist comments and

jokes, she contends that Mitchell's conduct has made her fearful for her safety because

she felt that he would either harm her or allow harm to her if they had to respond to a fire

together.  (Doc. 18, Ex. 4 at ¶6(a)(xiii).)  According to Quick, she was told by Linda

Hopson, a fellow employee, that Mitchell had sexually harassed her.  (Doc. 18, Ex. 4 at

¶6(a)(x).)  Quick also knew about Hopson's sexual harassment claim against Chief

Murray and Firefighter Eric Smith.  (Doc. 18, Ex. 4 at ¶6(a)(x).)  This knowledge made

Quick "feel that [the City] was not doing anything to keep males from harassing and

hurting women . . . and wanted to make the work environment so miserable and

threatening that the women, including [Quick], would resign."  (*Id.*)  Furthermore, Quick

claims that April Levins, a female firefighter, told her that Captain Barton had forcefully attempted to sleep with her, that this knowledge made Quick "fearful to sleep in the station," and that Barton's subsequent promotion made Quick feel "that the defendant condoned what happened to her." (Doc. 18, Ex. 4 at ¶6(a)(vii).) Finally, Quick states that she has been embarrassed, humiliated, and demeaned by male firefighters and supervisors' treatment of her and the City's refusal to allow her to do her job. (Doc. 18, Ex. 4.)

Quick has also presented evidence that the conduct unreasonably interfered with her ability to do her job. She states that she was afraid to sleep in the station, was required to perform tasks "below her classification," and not allowed to join the Katrina rescue efforts because she is a female. (Doc. 18, Ex. 4.)

Quick's hostile environment claim also requires her to establish a basis for holding the City liable. "Employer liability in a case involving sexual harassment by a co-worker exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000) (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982)). In the instant case, Quick complained of sexual harassment as early as 2003. It is undisputed that she complained to Battalion Chief Robert Sorrell on April 12, 2003 that her post was a hostile work environment. (Doc. 14 at 1.) She also wrote a letter to Ann Thompson of the City's Personnel Department reiterating her

complaints.  (*Id.*)  She filed an EEOC charge on April 23, 2003, alleging gender discrimination and a hostile work environment, including acts of intimidation by male co-workers and her supervisors.  (*Id.*)  On April 5, 2005, Quick filed a second EEOC charge, alleging harassment and unfair treatment.  (Doc. 17 at 3.)  Therefore, Quick has created an issue of fact that the City knew or should have known of the harassment.

For the foregoing reasons, the City's Motion for Summary Judgment is due to be denied as to Quick's hostile work environment claim.

### B.  Retaliation

Quick also alleges that the City retaliated against her for her complaints of discrimination.  In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action.  *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004).  If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for the adverse employment action.  *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual."  *Id.*

Quick engaged in protected activity in April 2003, April 2005, and March 2006. (Doc. 17 at 1-4.)  Because of the time between these instances of protected activity, the court will analyze the 2003 activity separately from the 2005 and 2006 activity.

*2003 Protected Activity*

On April 12, 2003, plaintiff informed Battalion Chief Robert Sorrell that her post, Station 7, was a hostile work environment, and that she planned to file a complaint. (Doc. 17 at 1.) Plaintiff reiterated her complaints two days later in a letter to Ann Thompson, an employee of the City Personnel Department. (Doc. 17 at 2.) On April 23, 2003, plaintiff filed a charge with the EEOC, alleging that she had been reassigned to another station during BFRS's investigation into her complaints, denied the opportunity to be assigned to a truck company or hazardous materials unit, subjected to a hostile work environment, not given the same respect as male drivers, and that her "suggestions to interact with other stations [were] met with resistence." (Doc. 17 at 2.)

Quick fails to establish a retaliation claim regarding her 2003 protected activity. First, the claim is not timely because Quick did not file her Complaint within ninety days of receiving the EEOC's right-to-sue letter. Second, Quick has not created an issue of fact that she was the victim of an adverse employment action.

*Timeliness*

The plaintiff has the initial burden of establishing that she filed her Complaint within ninety days of her receipt of the EEOC's right-to-sue letter. *Green v. Union Foundry Co.*, 281 F.3d 1229, 1233 (11th Cir. 2002); 42 U.S.C. § 2000e-5(f)(1) (1994). Quick filed her first EEOC charge on April 23, 2003. (Doc. 17 at 2.) She filed her Complaint on March 20, 2006. (Doc. 1.) Quick has not submitted any evidence

regarding when she received a right-to-sue letter.  Therefore, she has not met her burden

of establishing that her claim is timely.[5]

*Adverse Employment Action*

Quick alleges that BFRS retaliated against her by transferring her in response to

her complaint of discrimination.[6]  (Doc. 17 at 23.)  However, Quick's April 2003 transfer

and her subsequent transfers, were not adverse employment actions.

The Supreme Court recently clarified "how harmful [a challenged] action must be

to constitute retaliation."  *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.

Ct. 2405, 2406 (2006).  The Court held that "[t]he anti-retaliation provision covers only

those employer actions that would have been materially adverse to a reasonable employee

or applicant."  *Id.* at 2407.  Accordingly, "the proper formulation requires a retaliation

plaintiff to show that the challenged action might well have dissuaded a reasonable

worker from making or supporting a charge of discrimination."  *Id.* (internal citations and

quotation marks omitted).  Therefore, a "plaintiff need not show that she suffered an

action affecting the terms and conditions of her employment (which was [the Eleventh

---

[5] In any event, because she did not file her Complaint until March 20, 2006, it is highly unlikely that her Complaint was filed within 90 days of her receipt of a right-to-sue letter. Moreover, at oral argument, Quick's counsel conceded that any retaliation claim regarding her 2003 protected activity is not timely.

[6] Quick also alleges that BFRS retaliated against her by refusing to assign her to a standing committee and refusing to allow her an exemption to perform the fitness run.  (Doc. 17 at 23.) However, because these alleged adverse employment actions occurred in 2006, the court will analyze them in relation to Quick's 2006 protected activity.  (Doc. 14, Ex. 11 at 59-50; doc. 17 at 26.)

14

Circuit's] standard before *Burlington Northern*), but must show that she was subjected to action(s) that a reasonable employee would have found materially adverse such that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination." *Arnold v. Tuskegee University*, 212 Fed. Appx. 803, 810 n.4 (11th Cir. 2006) (internal quotation marks omitted).

For example, in *Burlington Northern*, after the plaintiff complained of sexual harassment, she was moved from forklift duty to standard track laborer tasks. *Id.* at 2406. The Court held that such "a reassignment of duties can constitute retaliatory discrimination where both the former and present duties fall within the same job description." *Id.* According to the Court, "[a]lmost every job category involves some duties that are less desirable than others." *Id.* Therefore, "[c]ommon sense suggests that one good way to discourage an employee such as [the plaintiff] from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Id.* at 2416.

Noting that "reassignment of job duties is not automatically actionable," the Court held that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances." *Id.* According to the Court, the reference to "*material* adversity" is intended to "separate

significant from trivial harms." *Id.* at 2407 (emphasis in original). "As such, certain behavior continues to be non-actionable under the retaliation provision such as 'petty slights or minor annoyances that often take place at work and that all employees experience,' 'personality conflicts at work that generate antipathy,' and 'snubbing by supervisors and co-workers.'" *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007) (quoting *Burlington Northern*, 126 S.Ct. at 2415).

Applying this standard to the facts of *Burlington Northern*, the Court found that there was a sufficient evidentiary basis that the plaintiff's reassignment might "have dissuaded a reasonable worker from making or supporting a charge of discrimination." The Court noted:

> [T]he jury had before it considerable evidence that the track labor duties were by all accounts more arduous and dirtier; that the forklift operator position required more qualifications, which is an indication of prestige; and that the forklift operator position was objectively considered a better job and the male employees resented [the plaintiff] for occupying it.

*Id.* at 2417 (internal quotation marks omitted).

In *Crosby v. Mobile County Personnel Board*, the Eleventh Circuit applied the *Burlington Northern* standard, and found that summary judgment was inappropriate on the plaintiff's retaliation claim. *Crosby*, 2007 WL 245126 (11th Cir. 2007). The court held that there was a genuine issue of material fact as to whether a reasonable employee would have found the following actions materially adverse:

Sheriff Tollman did not speak to [the plaintiff] for about a month after his deposition, and in May 2003, the Sheriff and Captain Barlow transferred him to the Support Services Division.  After the transfer, [the plaintiff] states that he was no longer allowed to attend the Chief Deputy's meeting; he was told not to attend the weekly staff meetings; he managed less deputies in the new position than he had in his previous position; his office was smaller and had no windows; his subordinate officers did not approach him about possible promotions, but instead, approached the Support Services Supervisor; his new position did not include a secretary; his unmarked sheriff's vehicle was replaced with a higher mileage, marked vehicle; and there was less overtime available in the new position.

*Id.* at *1.

In the instant case, Quick has not offered sufficient evidence that a reasonable employee would have found any of her transfers materially adverse such that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination.  Quick claims that her transfers had the "effect of disrupting the firefighter's bond with [her] team, forcing her to learn a new territory, and communicat[ing] that the complaining party is being punished."  (Doc. 17 at 24.) However, unlike the plaintiffs in *Burlington Northern* and *Crosby*, Quick has not offered any evidence that her new position was materially different from her old position.  The plaintiff in *Burlington Northern* offered evidence that her reassignment was dirtier, more arduous, and less desirable.  *Burlington Northern*, 126 S.Ct. 2405.  The plaintiff in *Crosby* submitted evidence that his new assignment made it more difficult to perform his duties and offered less overtime opportunity.  *Crosby*, 2007 WL 245126, at *1.  In the

instant case, Quick has not offered any evidence that her new assignment was more difficult, less desirable, or offered fewer opportunities.  Instead, she essentially asks the court to find that any lateral transfer of a firefighter is an adverse employment action because it requires the firefighter to adapt to a new fire station.

Other courts have found similar lateral transfers or denials of transfers to fall short of the *Burlington Northern* standard for material adversity.  In *Reis v. Universal City Development Partners, Ltd.*, the court held that, "because the responsibilities of the two positions at issue in [the] case are almost identical," "a reasonable person would [not] have found the denial of the request to transfer to be materially adverse."  *Reis*, 442 F.Supp.2d 1238, 1254 (M.D. Fla. 2006) (citing *Burlington Northern*, 126 S.Ct. at 2417).  In *Higgins*, the Eighth Circuit held that an Assistant U.S. Attorney's transfer was not materially adverse when "[s]he [did] not allege the new position was qualitatively more difficult or less desirable than the one she held in Rapid City."  *Higgins*, 481 F.3d at 590.

Quick's complaints regarding the transfer amount to the "petty slights or minor annoyances that often take place at work and that all employees experience" mentioned by the Court in *Burlington Northern*.  *Burlington Northern*, 126 S.Ct. at 2415.  Because she has not offered evidence of a retaliatory action that a reasonable person would have found to be materially adverse, Quick has not established a prima facie case of retaliation for her 2003 protected activity.[7]

_____

[7]Also, as noted above, this claim is not timely and is therefore due to be dismissed on that ground as well.

*2005 and 2006 Protected Activity*

On April 5, 2005, Quick filed a second EEOC charge alleging "hostility, animosity, unfair treatment with regard to work assignments[,] . . . and retaliation in regard to harassment, adverse job assignments, and/or transfers."  (Doc. 17 at 3.)  On March 20, 2006, plaintiff filed her Complaint.  (Doc. 1.)

*Adverse Employment Action*

Quick alleges the following retaliatory acts: "(a) the defendant's policy of transferring her, as well as any complaining employee, in response to a complaint of discrimination; (b) being denied assignment to a standing committee; and © not being afforded the exemption to perform the fitness run as other firefighters had received."[8] (Doc. 17 at 23.)

Quick alleges that her denial of appointment to a standing committee constitutes an adverse employment action because it amounts to a denial of an opportunity to further her career.  (Doc. 17 at 24.)  Carl Harper, the Assistant Fire Chief, testified that serving on a standing committee may be considered an honor or an advantage on a firefighter's resume.  (Doc. 14, Ex. 11 at 56-57.)  Assuming denial of appointment to a standing

---

[8]Quick's brief refers to multiple transfers, but only explains the circumstances or gives the dates of her transfer in April 2003.  (Doc. 17 at 1.)  However, like her April 2003 transfer, all of Quick's transfers were lateral.  For the reasons mentioned in the above discussion of the April 2003 transfer, Quick has not submitted evidence that any transfer involved a change in responsibilities, duties, or opportunities, or was an employment action that a reasonable person would have found to be materially adverse such it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

committee constitutes an adverse employment action, Quick has offered evidence of only one request (early January 2006) for an appointment to a standing committee.  (Quick aff. ¶8b.)  While she claims that she has been denied other appointments, she does not offer any evidence of when those requests were made.  Moreover, as to her January 2006 request for an appointment, Quick does not dispute that there has not been an opening on any of the standing committees since January 2006.  (Doc. 14, Ex. 11 at 60.)  According to Harper, no one has been assigned to a standing committee since January 2006.  (*Id.*)  Therefore, even assuming that the denial of appointment to a standing committee constitutes an adverse employment action, Quick has not offered evidence that she was actually denied such an appointment.

Even assuming that denial of appointment to a standing committee is an adverse employment action, and that Quick was actually denied such an appointment, Quick has not established a causal link between her protected activity and the adverse employment action.  While she seems to claim that she applied for appointment on multiple occasions, the only date she offers is January 2006.  Therefore, her application was before she filed her complaint in March 2006, and approximately eight months after her April 2005 E.E.O.C. Charge.  This temporal relationship is not close enough to establish a causal connection, and Quick has not offered any other evidence of a causal connection.  Therefore, even assuming that the denial of appointment to a standing committee is an adverse employment action, Quick has still not established a prima facie case.

20

Furthermore, even assuming a prima facie case, the City has articulated a non-discriminatory reason that Quick has not been appointed to a standing committee. According to the City, Quick did not request appointment until January 2006, and no individuals have been appointed since that time. Quick has not offered sufficient evidence to establish that the City's articulated reason is a pretext for unlawful retaliation.

Quick also alleges that she was denied the fitness run exemption in 2006 in retaliation for filing this action. (Doc. 17 at 26.) However, being forced to perform a fitness run is simply not an action that would dissuade a reasonable worker from making or supporting a charge of discrimination.

Even assuming that denial of an exemption for the fitness run is an adverse employment action, the City has offered a non-discriminatory reason for the denial. According to the City, the exemption was made for those firefighters who participated in the 5k portion of the Mercedes Marathon. (Doc. 14 at 16.) In order to qualify for the exemption, participants were required to register with Captain David Russell, who was in charge of the program. (*Id.*) The City contends that plaintiff never registered with Captain Russell and, when pressed, produced an application for the Mercedes Kids' Marathon, which is limited to children sixth grade and under, and involves a marathon run individually by children in quarter mile increments over several months. (*Id.*) Quick has not offered sufficient evidence establishing that the City's articulated reason is a pretext for unlawful retaliation.

21

For the foregoing reasons, summary judgment is due to be granted as to Quick's retaliation claim.

### C.  Disparate Working Conditions

Quick alleges that the city subjected her to sexually disparate treatment by providing inadequate shower, restroom, and changing facilities to female firefighters. (Doc. 17 at 9.)  To establish a prima facie case of disparate treatment, the employee must show that she "was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Title VII prohibits discrimination with respect to an employee's compensation, terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a).  "To establish an adverse employment action under Title VII, 'an employee must show a serious and material change in the terms, conditions, or privileges of employment,' as viewed by a reasonable person in the circumstances."  *Clark v. Potter*, 2007 WL 1244195, *1 (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)).

Quick's claim fails because she has not demonstrated that she suffered an adverse employment action.  Quick claims that Station 24 does not have a locker room for women and that she has to change clothes behind a curtain.  (Doc. 17 at 7.)  However, she has not presented evidence that the absence of a locker room or being required to change clothes

behind a curtain is more than a mere inconvenience, much less a serious and material

change in the conditions of her employment.[9]

     Quick also states that females at Station 24 are required to use the restroom in the

officers' quarters for showers, and are not permitted to use the male firefighters' restroom

except for cleaning of that facility.  (Doc. 17 at 7.)  When read in its entirety, it is clear

that this policy is intended to provide adequate and private facilities for females:

> Female personnel will notify the officer in charge before occupying the
> officers' bath.  Female and officers will secure the restroom door when in
> use.  Female personnel will inform the officer in charge when she has
> vacated the officers' bath.  Female personnel will not utilize the male
> firefighters' restroom except for cleaning of that facility.

(Doc. 18, Ex. 3 at 99-100.)  Quick has not shown how this policy is in any way

discriminatory.

     According to Quick, at Station 9, the only bathroom available for female use was

the public restroom in the "bay area" of the station.  (Doc. 17 at 7.)  Quick has not

submitted evidence that being required to use the same restroom as the public is an

adverse employment action.

     Quick cites *Wedow v. City of Kansas City, Missouri*, an Eighth Circuit case with

very different facts, in support of her claim.  In *Wedow*, the failure to provide female

firefighters with adequately fitting protective clothing was an adverse employment action

---

[9]The court recognizes that the need to change behind a curtain may be relevant to Quick's
hostile work environment claim, and refers only to her claim that she was subjected to inadequate
facilities.

because it made their jobs more difficult and hazardous.  *Widow*, 442 F.3d 661, 667 (8th

Cir. 2006).  "Because the protective clothing did not fit [the plaintiffs] properly, they

suffered injuries from fire and chemicals when the coats would not close properly, or too

large hats and boots would fall off while fighting a fire."  *Id.*  The plaintiff's "movements

were cumbersome and restricted by pants that caused them to trip or prevented them from

easily climbing ladders," and "[e]xcess length in the fingers of gloves made it difficult to

grip objects such as the fire hose."  *Id.*  With regard to showers and bathrooms, the court

noted:

> "[R]estrooms were located in the male locker rooms with the male shower
> room, doors were not secure, males had the keys, and where female
> restrooms existed, they were unsanitary and often used as storage rooms.
> Food and water for the station's pet dog were kept in the women's room in
> two stations and sexually explicit magazines and a poster were kept in the
> female restroom in station 23.  Most of the female restrooms that existed
> did not contain shower rooms and in some stations, the women's shower
> could be accessed only through the male bunkroom.

*Id.* at 668-69.  The court held that "[t]he record amply demonstrates that the terms and

conditions of a female firefighter's employment are affected by a lack of adequate

protective clothing and private, sanitary shower and restroom facilities, because these

conditions jeopardized [the plaintiff's] ability to perform the core functions of her job in a

safe and efficient manner."  *Id.* at 671-72.

　　　Here, Quick has not presented evidence that the facilities provided to females

jeopardized her ability to perform her job in a safe and efficient manner.  She has not

presented evidence that the showers and restrooms provided for females were unsanitary

or that they lacked privacy to the degree necessary for a finding of disparate treatment. Quick complains that Lieutenant Walker walked in on her while she was wearing a towel in April 2006 and that Ural Mitchell once tried walking in on her in the restroom.  While Mitchell's attempt to walk in on Quick may be relevant to her hostile environment claim, it does not establish that she was subjected to disparate treatment with regard to inadequate facilities.  As for Lieutenant Walker walking in on her while she was wearing a towel, the court finds that one such incident over the course of Quick's thirteen year career does not create a claim for disparate treatment.

For the foregoing reasons, summary judgment is due to be granted as to Quick's disparate treatment claim based on inadequate female bathroom and shower facilities.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 14), is due to be granted as to plaintiff's retaliation and disparate working conditions claims, and denied as to plaintiff's hostile work environment claim.  An order will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 10th day of September, 2007.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

25